WILLIAM H. HARKER, *ET ALS.*, PLAINTIFFS, v. JAMES C. McKISSOCK, *ET ALS.*, LESTER INVESTMENT COMPANY AND SHIPBUILDING EDUCATIONAL SOCIETY, DEFENDANTS - APPELLANTS; RESPONDENTS ON CROSS - APPEALS, AND INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, AN UNINCORPORATED ASSOCIATION, DEFENDANT, CROSS-APPELLANT, AND NEW YORK SHIPBUILDING CORPORATION, DEFENDANT, RESPONDENT ON CROSS - APPEALS, AND INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, LOCAL NO. 1, IN AFFILIATION WITH INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS AND HELPERS OF AMERICA, LODGE No. 801, A. F. L., APPLICANT FOR INTERVENTION-APPELLANT.

Argued February 9, 1953—Decided April 27, 1953.

*Mr. F. Morse Archer, Jr.*, argued the cause for the defendant appellants James C. McKissock, *et als. (Messrs. Boyle, Archer & Greiner,* attorneys).

*Mr. William S. Zink* argued the cause for the appellant applicant for intervention, Industrial Union of Marine and Shipbuilding Workers of America, Local No. 1 *(Mr. William T. Cahill,* attorney).

*Mr. M. H. Góldstein,* of the Pennsylvania bar, argued the cause for the cross-appellant Industrial Union of Marine and Shipbuilding Workers of America *(Mr. Albert B. Melnik,* attorney).

*Mr. George D. Rothermel* argued the cause for the respondent New York Shipbuilding Corporation.

The opinion of the court was delivered by

HEHER, J. On a prior submission of this cause, it was held that there had been a valid secession of Local Union No. 1 from the defendant parent body, the cross-appellant herein, Industrial Union of Marine and Shipbuilding Workers of America (known in organizational parlance as the "National Union"), but that a self-executing provision of the National Union's constitution for the transfer, upon disaffiliation, of the local affiliate's property to National is

valid and enforceable, and the judgment of the Appellate Division of the Superior Court which resolved the first issue in the affirmative and the second in the negative was modified accordingly, and the cause was remanded for execution of the judgment as modified. *Harker v. McKissock*, 7 *N. J.* 323 (1951).

The individual defendants and the corporate co-defendants, Lester Investment Company and Shipbuilders Educational Society, applied for a rehearing on the ground that forfeiture of the property of Local No. 1 had been decreed, although the Local itself was not a party to the suit, either as an entity or by representation. The contention was that Local was not properly joined as a party plaintiff, and therefore the judgment was not binding against Local as an entity, although in their answer the individual defendants acknowledged that they were the duly constituted officers and trustees of Local and authorized to represent the body in the proceedings. The motion for a rehearing was denied. We pointed out that Local had not prayed for leave to intervene or for a rehearing and vacation of the judgment to that end, and that the judgment was binding upon the applicants for a rehearing, and there was no occasion then to consider whether Local was before the court as an entity, assuming that it could sue or was suable as an artificial person, or by virtual representation through the individual defendants as its officers and trustees, for a decision of that question in favor of representation would result in the same challenge then interposed, namely, that it was taken without affording the entity a hearing. 8 *N. J.* 230 (1951).

## I.

Upon the remission of the cause to the Superior Court, Local No. 1, then and now in affiliation with International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America, Lodge No. 801, AFL, moved for "leave to intervene as a party" to the action "in order to assert the claims" pleaded in the amended complaint, on the hypothesis that

the local unit was not "an actual party" to the proceeding, "either as plaintiff or as defendant," and "the representation" of its "interests by existing parties is inadequate." The motion was denied, and Local appeals.

It is said that Local did not authorize "the institution of suit in its name," and the individual plaintiffs represented but a few of Local's members and did not and because of conflicting interests could not have adequately represented the membership in a class action, citing *Giordano v. Radio Corporation of America*, 183 *F.* 2d 558 (*C. C. A.* 3, 1950); and that since the "entire theory" of the case "was predicated upon the fact" that the individual plaintiffs "were the true Local," and the individual defendants "were tort feasors who were acting independently and against the interest of Local," it cannot be deemed that Local was a party to the suit. In a word, the contention is that Local was not sued "in its name as a defendant," and the individual defendants were not sued "as representatives" of Local, but as tortfeasors, and therefore Local was not a party defendant, "either by name or through virtual representation." It is urged that Local is a "legal entity," and the officers and trustees "are only trustees for the legal body, to wit, Local; they are not *the* Local"; the officers and trustees, "taken together or separately, are no more Local than are the directors of a corporation the corporation," and "Local as a legal entity must be the party litigant, and as such is legally entitled to be made a party" and to make answer and defend its "property and rights" and to be represented by counsel of its own choosing.

The point is not well made. Local's collective membership was adequately represented in the proceedings, and the association is concluded by the judgment.

■■ A voluntary unincorporated association is an aggregate of persons under a common name for the pursuit of a common enterprise. Absent a creative statute, an association is not in itself a legal entity, separate and distinct from the persons who comprise the society. *Sanchez v. Bowers*, 70 *F.* 2d 715 (*C. C. A.* 2, 1934); *Hall v. Essner*, 208 *Ind.* 99,

193 N. E. 86 (*Sup. Ct.* 1934); *Hanley v. American Railway Express Co.*, 244 *Mass.* 248, 138 N. E. 323 (*Sup. Jud. Ct.* 1923). A corporation derives its existence from a state franchise; an association, from the consensual agreement of the component members, who act not by a distinct entity but by virtue of a mere agency. *Austin v. Searing*, 16 N. Y. 112 (*Ct. App.* 1857); *Niagara County v. People*, 7 *Hill* 504 (*Ct. Err.* 1844); *Ostrom v. Greene*, 161 N. Y. 353, 55 N. E. 919 (*Ct. App.* 1900).

██ It is the rule at common law, proceeding on this premise, that absent an enabling statute, a voluntary association cannot sue or be sued in the associate name. Since the association does not constitute a separate legal entity, the action is maintainable only by or against the members collectively; and under the doctrine of virtual representation, where the members of the society are too numerous to be joined in one action, one or more of the members may sue or defend on behalf of themselves and all others similarly situated. *Moffat Tunnel League v. United States*, 289 U. S. 113, 53 S. Ct. 543, 77 L. Ed. 1069 (1933); *Karges Furniture Co. v. Amalgamated Woodworkers' Local Union No.* 131, 165 *Ind.* 421, 75 N. E. 877, 2 L. R. A., N. S. 788 (*Sup. Ct.* 1905); *Pickett v. Walsh*, 192 *Mass.* 572, 78 N. E. 753, 6 L. R. A., N. S. 1067 (*Sup. Jud. Ct.* 1906); *Carpenters Union v. Citizens Committee*, 333 *Ill.* 225, 164 N. E. 393, 63 A. L. R. 157 (*Sup. Ct.* 1928); *United Brotherhood of Maintenance of Way Employees and Railway Shop Laborers v. Kennedy*, 13 *Del. Ch.* 106, 115 A. 587 (1922). 4 *Am. Jur.* 485; 7 C. J. S., *Associations*, § 35, *p.* 82. The common-law status of an unincorporated association, so far as being made a party to an action, is akin to that of a partnership. Annotation, 6 *Am. Cas.* 833. The rule is the same in law and in equity, except that under the equity practice of parties by representation, a few of the members may represent all where there is a common interest in the subject matter of the litigation, or where the parties are too numerous to be joined. *Kline v. Knights of the Golden Eagle*, 113 N. J. Eq. 513 (*Ch.* 1933); *Donovan v. Danielson*, 244 *Mass.*

432, 138 *N. E.* 811 (*Sup. Jud. Ct.* 1923); ,*Maguire v. Reough,* 238 *Mass.* 98, 130 *N. E.* 270 (*Sup. Jud. Ct.* 1921).

In New Jersey we have a statute providing that an unincorporated association consisting of seven or more persons may sue or be sued in its common name in any action or suit affecting its common property, rights and liabilities, as effectually as if the action or suit were prosecuted by or against all the members thereof; but, as concerns suits of an equitable nature, the act has no application to "a fraternal, charitable or other organization not organized for pecuniary profit." *R. S.* 2 :78–1; 2 :78–6; *N. J. S.* 2*A* :64–1; 2*A* :64–6. As to suits in equity, therefore, the enabling act does not seem to cover associations such as the local union here. Yet, independently of statute, Chancery has long entertained jurisdiction of suits instituted against labor unions by the associate name. *Vide Newark International Baseball Club, Inc, Inc. v. Theatrical Managers, Agents & Treasurers Union,* 125 *N. J. Eq.* 575 (*Ch.* 1939); *Moran v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators,* 139 *N. J. Eq.* 561 (*Ch.* 1947).

But this practice, whatever its virtue, has not superseded the equitable doctrine of virtual representation. *Rule* 3 :23–1 embodies this mode of acquiring jurisdiction over the collective membership of an association of this class. It is provided that if persons constituting a class are so numerous as to make it impracticable to bring them all before the court, "such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued."

The principle has application here, and accordingly Local was afforded a full and adequate hearing of all the issues on the merits, and is bound by the judgment.

The individual plaintiffs, naming Local as a party plaintiff by the common name, brought the action, not only in their own right, but as well for and on behalf of all other members of Local in good standing "similarly situated and aggrieved as are the individual plaintiffs." Conceding, *arguendo,* that the individual plaintiffs did not have the capacity to represent

in a class action the overwhelming majority of the membership favoring disaffiliation, such representation was afforded in fact by the individual defendants as duly authorized officers and trustees of Local, and thus there was the vicarious protection of interests requisite for a judgment concluding the whole membership on the issues litigated.

As this court noted in disposing of the motion for a rehearing (8 *N. J.* 230), the answer acknowledged that the individual defendants "are the duly constituted officers and trustees of Local No. 1 and as such are representing said Local No. 1 in this litigation and in its affairs generally," and Local No. 1 "is, in fact, represented by James C. McKissock and the other individual defendants herein named, who are its duly elected officers and trustees." These admissions were not repudiated on the motion to intervene now before us. Indeed, on the oral argument of the appeal, it was acknowledged that the individual defendants were represented throughout the proceedings eventuating in the judgment by counsel retained and compensated by Local, who also had recourse to its treasury for the payment of all other costs and expenses incident to the litigation. Through the individual plaintiffs and defendants, all interests were represented. The association knew of the suit, and authorized a defense in its behalf by its own officers represented by its own counsel. There is no contention of inadequate representation. The collective membership was accorded due process; it would be a distortion of the principle if by this device a relitigation of the issues were now permitted. *Rule* 3 :24–1 authorizes intervention "upon timely application" when the representation of the applicant's interest "by existing parties is or may be inadequate" and the applicant "is or may be bound by a judgment in the action."

II.

There is an appeal by the defendants McKissock, *et al.*, Lester Investment Company, and Shipbuilders' Educational Society from an order of the Superior Court made June 17,

1952 denying their motion (a) to amend a stipulation made during the trial of the cause by exscinding a concession that Local No. 1 was the "real and beneficial owner" of the property standing in the name of Shipbuilders' Educational Society, and for leave to adduce evidence bearing upon what is said to be (b) the "true intent" of article IV, section 22 of the National's constitution and (c) "in respect of Allied War Relief Funds."

As to (a), the contention is that in this regard the stipulation was "in form an answering pleading" to an allegation of such ownership embodied in the complaint, a conclusion of law that is not good pleading but an infringement upon the court's function and ineffective as an admission because not directed to "matters properly pleaded." These cases are cited: *Schulz v. State Board of Education*, 132 *N. J. L.* 345 (*E. & A.* 1945); *Swift & Co. v. Hocking Valley Railway Co.*, 243 *U. S.* 281, 37 *S. Ct.* 287, 61 *L. Ed.* 722 (1916). The admission of ownership is characterized as "obviously an error of inadvertence and mistake." This is the offer of proof: the Educational Society is a nonprofit corporation organized under the laws of New Jersey on December 16, 1940. The corporation was established, as declared in the certificate of incorporation, for the "moral and mental improvement" and the education and recreation by the modes and methods therein delineated "of the men employed in the shipbuilding industry in and about the City of Camden, New Jersey, as well as of the members of the families of such men." Membership in the Society was and is available to members of Local in good standing "who are engaged in the shipbuilding industry in Camden," but not to employees of National, employees of Local, or members of Local employed in "allied industries." The Society has "full legal and equitable title" to real estate devoted to such uses; but "certain moneys" were provided by Local to defray the purchase price, termed "donations" made by Local "in full conformity" with its by-laws and without objection by National. The Society's laws are silent as to the disposition

of its property in the event of dissolution. *R. S.* 15:1–20 provides that, upon dissolution, the corporate assets shall be distributed in accordance with the by-laws, or, absent such provision, *per capita* among the membership.

National denies that the admission was induced by mistake, alleges bad faith, laches and estoppel, and maintains that the tendered evidence "will not alter or negate" the stipulation of ownership.

We hold that the vital issue of the "real and beneficial ownership" of the real property reposing in the name of this self-contained Society cannot justly be made to depend upon the admission now sought to be withdrawn. This inquiry does not involve the admission of evidence at variance with the intent expressed in article IV, section 22 of the National constitution, but rather the question of whether Local has such interest in the real property of the independent corporate entity as under that provision would subject the legal and beneficial title to automatic transfer upon Local's disaffiliation. We cannot assess the proffered evidence at this stage of the proceeding. The issue would seem to be whether the essential contractual design was to make separate and distinct provision for the moral and mental uplift, benefit and advantage of those employed in the shipbuilding industry in Camden who from time to time have membership in Local, and their families, and in furtherance of that end to place the corporate entity and its property and function wholly beyond the operation of this section of the National constitution in the event of Local's separation. And if such was the intention, was it effectuated accordingly and in keeping with the policy of the law? It would seem that what was done here did not give rise to a trust in the technical sense, but rather a *quasi*-trust, if a trust at all, for the service of the moral, social and intellectual interests of the members of Local and their families. Compare *Brigham v. Peter Bent Brigham Hospital*, 134 *F.* 513 (*C. C. A.* 1, 1904). But however it may be termed, the critical inquiry is whether the corporate property was so divorced from Local, by valid

means, as not to be comprised within the stated terms of the National constitution when disaffiliation was had.

But parol evidence is not admissible to vary or contradict this provision of the constitution.

The overruled offer of proof was that at the National convention held in 1936, "the various Locals were assured that the sole purpose of the forfeiture clause was to protect investments which were then being made by the National Union in Locals which it was then organizing"; that "the National's officers made unreserved representations to delegates from Local No. 1 that the clause would never be used against it"; that "Local No. 1 and the other Locals present in 1936 were assured and reassured that this clause constituted nothing more than a security device to enable the National Union to recapture its own assets," and "the amendment would have failed of passage had not these warranties and representations been relied upon and believed." It is urged that the parol evidence rule is not invocable to bar "proofs as to the correct and proper understanding of the items to be covered by the forfeiture clause."

The "parol evidence rule" is not a rule of evidence, but a rule of substantive law. It is not concerned with the probative trustworthiness of particular data, but rather with the source and the components of jural acts. In determining the constitutive parts of jural acts certain kinds of fact are legally ineffective in the substantive law. The embodiment of the terms of a jural act in a single memorial constitutes the integration of the act, *i. e.,* its formation from negotiations and transactions in themselves without jural effect into "an integral documentary unity"; and it is a legal consequence of such integration that "all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act." *Wigmore on Evidence* (3rd ed.), section 2425. The integration of a transaction is either voluntary or compulsory by law. The essence of voluntary integration is the intentional reduction of the act to a single memorial; and where such is the case the law deems the writing to be the sole and indisputable

repository of the intention of the parties. *Downs v. Jersey Central Power & Light Co.*, 117 N. J. Eq. 138 (E. & A. 1934); *Franklin Fire Insurance Co. v. Martin*, 40 N. J. L. 568 (E. & A. 1878); *Naumberg v. Young*, 44 N. J. L. 331 (Sup. Ct. 1882); *Van Syckle v. Dalrymple*, 32 N. J. Eq. 233 (Ch. 1880); *Kelly v. Cunningham*, 1 Allen (Mass.) 473 (Sup. Jud. 1861); *Harris v. Rickett*, 4 H. & N. 1 (1859). The jural consequences are the same where there is compulsory integration, *i. e.*, pursuant to legal mandate irrespective of the will of the parties. *Wigmore on Evidence* (3rd ed.), *sections* 2427, 2450.

This principle serves to bar parol variation of the intent expressed in the provision of the National constitution cited *supra*. The document is testimonially conclusive. The relationship between National and Local proceeded from a consensual agreement delineated in National's constitution. The affiliation was based upon a voluntary contract which embodied the property clause of the constitution as a constituent element. The intention thus expressed is the law of the contract; and as in the case of all other contracts, and for the same reason, the contractual expression is proof against parol variation. 7 N. J. 323. See, also, *Wigmore on Evidence* (3rd ed.), *section* 2451.

Extrinsic evidence of a substantially different intention is not admissible to overcome and qualify the intrinsic force of the written words "all monies, books, and properties" constituting the embodiment of the jural act. Evidence of the circumstances attending the integration is admissible, not to vary or contradict the terms of the writing, but to secure light by which to measure its actual significance. The inquiry is essentially interpretive. So far as the evidence would show, not the meaning of the writing, but an intention wholly unexpressed in the memorial, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the manifest general purpose. *Casriel v. King*, 2 N. J. 45 (1949); *Atlantic Northern Airlines, Inc. v. Schwimmer*,

this day decided, 12 *N. J.* 293 (1953). The "parol evidence rule" purports to exclude testimony "only when it is offered for the purpose of 'varying or contradicting' the terms of an 'integrated' contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms." *Corbin on Contracts, sections* 536, 543.

But extrinsic evidence is admissible in equity to relieve against the consequences of fraud, accident, surprise, or mistake. The grounds for reformation of the writing or rescission for fraud or mistake may be established by parol. *Downs v. Jersey Central Power & Light Co.,* 117 *N. J. Eq.* 138 (*E. & A.* 1934); *Corbin on Contracts, section* 580.

As to (c) it is represented that the "Allied War Relief Fund" is constituted of assessments levied against Local's members "for the benefit of union members in the armed services and for other service-connected endeavors," and in its very nature is a dedicated trust fund not the property of Local within the concept of the self-same provision of the National constitution. It is said in reply that there is no allegation that "such testimony and proof were not available" to the movants, "or were not discovered until the time of the filing of the motion," but that in point of fact the contrary is the case; and that, at all events, "these funds are the property of the National Union" under this clause of its constitution, and "the National Union is properly entitled to administer" them "and to use them for the purposes for which they were collected."

We think that, in the interest of essential justice, the nature and quality of this fund should be determined, and available pertinent evidence should be received to that end. If these are trust funds, for the stated special purpose, it would seem that they are not within the category of property which automatically passed to National upon Local's separation. National's suggestion that, notwithstanding the severance of relationship, it is entitled to administer the asserted trust under the transfer clause of the constitution is obviously untenable.

## III.

The National Union's cross-appeal makes a two-fold attack on the judgment: first, in adjudging that Local is "the sole, legal and beneficial owner and exclusively entitled to the use" of the name "Industrial Union of Marine and Shipbuilding Workers of America, Local No. 1"; and secondly, in declaring that National has no right, title or interest in a collective bargaining agreement made between Local and New York Shipbuilding Corporation on September 22, 1947, as amended and extended to June 23, 1950, or in the assignments from wages of the equivalent of union dues and initiation fees made by the individual employees and members of Local, or to the fund created by the employer's "check-off" from wages between the date of Local's disaffiliation, September 28, 1948, and the execution of a new collective bargaining agreement on June 28, 1950 between the employer corporation and Local, then in affiliation with the International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America, Lodge No. 801, AFL. Between September 28, 1948 and December 20, 1949, the employer corporation turned over the proceeds of the checkoff to the disaffiliated Local. After December 20, 1949 and until July 12, 1950, the moneys checked off were delivered to the Clerk of the Superior Court. The judgment awarded all of the moneys to Local. These are asserted to be items of property subject to the operation of the property clause of the National constitution, and within the protection of the Fourteenth Amendment.

The first contention is well founded. The "property" which by that provision of the constitution automatically passed to National upon Local's disaffiliation comprised the charter and seal of the disaffiliating local. The charter established Local as an affiliate of National under the name of "Local No. 1 of the Industrial Union of Marine and Shipbuilding Workers of America." The voluntary surrender of the charter by disaffiliation of necessity included the

name under which Local was identified as an affiliate of the parent union; for the retention of the name would suggest the affiliation which had been terminated and constitute a species of deception inimical to the interests of the parent union which are within the protection of the law. The members of the parent union have an interest in the name and the good will attached to its use which is invaded by an unauthorized use of the label by others. The inevitable confusion as to identity and relationship is without more ground for relief. *Cape May Yacht Club v. Cape May Yacht & Country Club*, 81 *N. J. Eq.*.454 (*Ch.* 1913); *Rosenthal v. Blatt*, 80 *N. J. Eq.* 90 (*Ch.* 1912); *Schmalz v. Wooley*, 57 *N. J. Eq.* 303 (*E. & A.* 1898); *Purcell v. Summers*, 145 *F. 2d* 979 (*C. C. A.* 4, 1944); *Grand Lodge Improved Benevolent Protective Order of Elks of the World v. Eureka Lodge No. 5, Independent Elks*, 114 *F. 2d* 46 (*C. C. A.* 4, 1940); *Brown v. Hook*, 79 *Cal. App. 2d* 781, 180 *P. 2d* 982 (1947); *National Circle, Daughters of Isabella v. National Order of the Daughters of Isabella*, 270 *F.* 725 (*C. C. A.* 2), *certiorari* denied, 255 *U. S.* 571, 41 *S. Ct.* 376, 65 *L. Ed.* 791 (1921). This quite apart from the provision of the National constitution cited *supra* which in itself operates as a transfer of the name granted by the charter. It is axiomatic that by its very nature disaffiliation comprehends the relinquishment of the indicia of affiliation.

But by the same token disaffiliation ended National's interest in the then current collective bargaining agreement between Local and the employer corporation, and as well, and for the same reason, in the member-employees' individual wage assignments covering union dues and initiation fees under the check-off system and the fund thereby created subsequent to disaffiliation. If, to quote from the National Union's brief, the members of Local by the act of disaffiliation "gave up their membership in the National Union" and "could not lawfully continue to use the name of the National Union as part of the name of the Local," so also the valid exercise of the reserved right of disaffiliation terminated the parent union's interest in Local's collective bargaining agree-

ment and the dues and initiation fees thereafter collectible by the check-off process under that agreement.

The argument *contra* is that the collective bargaining agreement (*art. 2, sec. 2*) laid upon Local's members the "obligation to remain members of the Union for the duration of the agreement," and membership the duty "to pay dues so long as they remained members, *i. e.* so long as they remained in the Corporation's employ and while the union-shop provision of the collective bargaining agreement remained in effect," a duty "further fixed" by "their check-off assignments, which were irrevocable for annual periods during the life of the agreement, as well as by the check-off provision of that agreement"; and that even though the parent union could not, after disaffiliation, act as collective bargaining representative of Local's members, its right "as against" Local "to receive the check-off funds does not depend upon succession to the entire agreement, but is amply supported by the National Union's succession to the check-off provision and to such interest as the Local had in the check-off assignments." "Rights of successorship" to Local's interest in the check-off provision of the collective bargaining agreement and in the check-off assignments are asserted under the cited property clause of the National constitution; but it is insisted that the parent union itself also has "a direct and independent interest" in the agreement and the "proceeds of the assignments." It is suggested that the corporation's employees had membership in the parent union as well as in the local unit.

There is self-evident fallacy in this reasoning. The provision of the collective bargaining agreement thus invoked embodies the principle of the union shop. The corporation undertook to employ only members of Local "in good standing insofar as the payment of dues and initiation fees are concerned." National had no interest whatever in the performance of this agreement after Local's separation. It was not a signatory party to the agreement. The "check-off" was merely in aid of the collection of dues and initiation fees; the agreement bound the corporation to transmit the

checked-off dues to Local, although the wage assignments were made to National and Local. But the form of the assignment has no determining significance in this regard. Whatever interest the parent union had in the dues to be collected by the check-off device ceased on Local's disaffiliation; and by the same reasoning whatever right, title or interest National had in the wage assignments underlying the check-off also ceased and determined. The continuance of the individual employee-assignor in the corporation's service had no relevancy after the separation; the basic relationship had come to an end. Having no further interest in the subject matter of the assignments, National had no enforceable right in the assignments themselves. The one is a necessary consequence of the other. Such interest as National had in the assignments was not "irrevocable"; its right to enforce the assignments continued only so long as it had an interest the assignments were designed to effectuate. The assignments were but instruments of contract policy of no concern whatever to the parent union once disaffiliation had been effected in consonance with the underlying contract. This, too, is axiomatic—a corollary of the basic consensual relation, a quality predictable of the affiliation itself. In a word, National's contractual rights and interests were subject throughout to a valid exercise of the retained right of disaffiliation; and the act of disaffiliation concluded the relationship and all rights of property and otherwise dependent upon its continuance.

And, largely for the same reasons, the assignments do not constitute property of Local subject upon disaffiliation to automatic transfer under the property clause of the National constitution. The right of succession thereby given is not inclusive of dues and initiation fees accruing to Local after disaffiliation was had. This would seem to be indisputable; yet the contrary is the core of the argument. It is said that the check-off provision and the wage assignments are "choses in action" not "in nature different from a promissory note payable in installments, and the right to receive the future money payments promised thereunder, being property or

'monies' of the Local." But there is no essential resemblance. Dues to accrue *in futuro* are plainly not within the category of property passing to the parent union on separation of the local unit. The obvious purpose of including National as a co-wage-assignee was the protection of its *per capita* tax, ended by the separation. There is no other conceivable reason. As to after-accruing wages, the assignment was gratuitous and defeasible by the termination of the relation which conditioned its continuance. *Vide Restatement, Contracts, sections* 158, 170.

The case of *Walter Kidde & Co. Inc. v. United Electrical, Radio & Machine Workers of America,* 7 *N. J.* 528 (1951), is not to the contrary. There, the articles of association included a loyal-minority clause for the continued function of the local component; an act of succession, disaffiliation or dissolution was null and void "if seven or more members indicate(d) their desire to retain the local charter." Under this clause, the local continued in existence after the purported disaffiliation until disbanded by appropriate corporate action, following the selection by the plaintiffs' employees of a newly-chartered local of another union as their collective bargaining representative at an election held by the National Labor Relations Board; and the litigation concerned dues checked-off prior to the dissolution of the local unit. The holding was that the moneys "reverted" to the parent body under a clause of its constitution making such disposition of a dissolved local's funds and property if within a year there was no application for a new charter by at least fifteen former members of the defunct unit. It was found that "Until disbandment," the local's "identity remained unchanged," and the members of the newly-organized local of the second union "were not members" of the original local unit at the time of its dissolution, and they had "no interest whatever in the property of the dissolved" local. The factual differences are fundamental; the principle is the same.

The judgment is accordingly affirmed and reversed in part; and the cause is remanded for further proceedings conformably to this opinion.

*For affirmance in part and reversal in part*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*Opposed*—None.